A05A2352. CITY OF CAIRO v. HIGHTOWER CONSULTING ENGINEERS, INC. et al.
A05A2353. MACTEC ENGINEERING & CONSULTING OF GEORGIA, INC. v. CITY OF CAIRO et al.
(629 SE2d 518)

PHIPPS, Judge.

The City of Cairo sued Mactec Engineering & Consulting of Georgia, Inc., formerly known as Law Engineering & Environment Services, Inc., and Hightower Consulting Engineers, Inc. to recover damages it incurred in connection with the malfunction of its wastewater treatment facility. After a trial, judgment was entered upon the jury's verdicts against the defendants. In Case No. A05A2352, the City contends that its award against Law Engineering was improperly capped. We do not reach the merits of this contention because the City failed to preserve review of the issues it raises. In Case No. A05A2353, Law Engineering contends that the City's suit against it was barred by statutes of limitation and the economic loss rule. Finding no merit in either ground, we affirm.

In 1993, the City of Cairo contracted with Hightower Consulting to design and build a land application system ("LAS"), an irrigation system for disposal of the City's wastewater. According to the City and Law Engineering, an LAS works as follows: wastewater is collected and initially treated; the wastewater is sprayed onto a tract of land, where it is absorbed into and treated by the soil; and the resulting water eventually becomes part of the local water table.

An initial step in this project was to locate suitable land that would allow the wastewater to permeate the soil without significant

---

[16] See id.; *Lewis*, supra at 571.

runoff. The City identified to Hightower Consulting an approximately 900-acre tract of land on which it held an option to purchase and instructed it to solicit proposals from engineering firms to conduct soil investigations at the site. One firm that Hightower Consulting solicited was Law Engineering. Hightower Consulting sent that firm a letter informing it, "The City of Cairo has requested that we seek from you a proposal to perform" certain work items "associated with a[n] LAS Site that the city is considering." Attached to the letter was a "Request for Proposals for the City of Cairo," stating that "The City of Cairo acting through its agent, Hightower Consulting Engineers, requests that you submit a proposal to accomplish all the necessary and appropriate tasks in association with both field and office work to complete a Detailed Soil Investigation Report" for a proposed site for the LAS. The request further explained that the work solicited was for the determination whether the proposed site was suitable for use as "a land application site for up to 2.0 million gallons per day of treated wastewaters." And it specified that particular provisions of the Georgia Environmental Protection Division (EPD) "shall govern the standards for accomplishment for this project."

Law Engineering faxed a proposal to Hightower Consulting, confirming that it understood that the City was "considering construction of a wastewater treatment facility consisting of a land application site for as much as 2.0 million gallons per day of treated wastewater." The proposal outlined services that Law Engineering would complete, including evaluating the soils at the proposed site for permeability ranges. The proposal priced the services at approximately $24,075 and instructed, "If this proposal is acceptable, please execute a copy of the attached Proposal Acceptance Sheet to formalize the agreement. The attached statement of General Conditions is a part of this proposal."

On October 11, 1993, Hightower Consulting faxed the proposal to the City's utilities director, who, according to Hightower Consulting, was the person the City had placed in charge of the LAS project. That evening, the City Council voted to accept Law Engineering's proposal. The City's utilities director notified Hightower Consulting of the City's decision and instructed it to sign the contract and proceed with the project.

Hightower Consulting signed the acceptance sheet that had been included with the proposal Law Engineering had since mailed to it. The acceptance sheet provided, "The Terms and Conditions of this Proposal, including the Terms on this page and the attached General Conditions are: Accepted this 13 day of October, 1993." Hightower Consulting then mailed that proposal to the City's utilities director on October 14, 1993.

Thereafter, Law Engineering began its work at the site. In January 1994, it submitted to Hightower Consulting "[its] report of the soil evaluation for the proposed municipal wastewater irrigation system for the Town of Cairo, Georgia." Therein, Law Engineering concluded that the entire tract of land was suitable for an LAS and set forth the analyses it had employed in reaching that conclusion. During the next few months, the City paid Law Engineering's invoices.

The City purchased the land. Relying on Law Engineering's report, Hightower Consulting designed and oversaw the construction by third parties of the LAS on approximately 300 acres of the land. Construction of the LAS was completed in early 1998.

In March 1998, the City activated its LAS. The surface area became saturated. There was immediate runoff on all spray areas; streams left the LAS site in all directions; and there was significant erosion throughout. The EPD cited the City because of "[r]un off from active spray fields" onto unintended areas.

Evidence showed that the LAS had malfunctioned, at least in part, due to services provided by Law Engineering. The City's expert in land application systems and civil engineering testified that in June 1998 the City retained the engineering firm where he was employed to evaluate the design and operation of the LAS because of "ponding" and runoff problems. He investigated the LAS site and described, "[I]t's the worst I've ever seen." He examined Law Engineering's report and determined that in evaluating the soils, Law Engineering had failed to comply with EPD guidelines in a number of respects. He concluded that the soils made the site unsuitable for an LAS.

Similarly, the City's expert in soil science testified that in 2000 the City retained him to evaluate pervasive, ongoing problems in connection with its LAS. The expert described the condition of the City's LAS: "[I]t was a pretty massive failure in my mind. I've never seen a system that had that much wrong with it in terms of the amount of water running over the surface. The soils were not taking in the water. . . ." After investigating the site and studying Law Engineering's report, the expert determined that Law Engineering had deviated from EPD guidelines in conducting its soil analysis, failed to conduct soil permeability testing upon substantial portions of the tract, applied wrong factors in fundamental calculations for determining the permeability of the soils, and erred in mathematical computations. The expert's own analysis of the site revealed that about 108 of the 300 acres where the LAS was situated were unsuitable for irrigation because of inadequacies of the soils. The expert testified that, excluding the unsuitable areas and employing accurate calculations, the site's capacity was approximately 700,000 gallons

per day. The expert concluded that it was impossible for the LAS site ever to handle the millions of gallons per day, for which the irrigation system had been designed.

In August 2002,[1] the City filed suit against Hightower Consulting and Law Engineering, alleging, among others, various negligence theories. In summary judgment and directed verdict motions, Law Engineering argued that the City's claims were barred by various statutes of limitation and by the economic loss rule. Alternatively, Law Engineering argued that, if it were found liable, recovery against it was limited pursuant to Paragraph 5 set forth on the "Terms and Conditions" page of the proposal it had forwarded to Hightower Consulting. That paragraph pertinently provided,

> Client agrees that Law Engineering's liability to Client or any third party due to any negligent acts, errors or omissions or breach of contract will be limited to an aggregate of $50,000 or our total fee, whichever is greater. If Client prefers to have higher limits of professional liability, we agree to increase the limit up to a maximum of $1,000,000 upon Client's written request at the time of accepting our proposal, providing that Client agrees to pay an additional consideration of ten percent of our total fee, or $500, whichever is greater.

The trial court denied Law Engineering's motions.

The jury found against both defendants, returning the following verdict:

> Plaintiff should recover general damages in the amount of $1,081,057.50. These damages shall be apportioned (if you shall desire to apportion) as follows: Defendant Law Engineering and Environmental Services, Inc.,: $50,000. Defendant Hightower Consulting Engineers, Inc.,: $1,031,057.50.

There were no objections to the form of the verdict, and the trial court dismissed the jury.

About two weeks later, the City filed a motion for addittur, urging the trial court to declare Paragraph 5 unenforceable as a matter of law. In support of its motion, the City filed an affidavit of the jury foreperson, averring that the jury had reduced its initial calculation of damages against Law Engineering based upon "the $50,000.00

---

[1] The parties agree that they entered into a series of agreements tolling the statute of limitation in this case from March 22, 2001 until August 2002, when the suit was actually filed.

liability limit in Law Engineering's terms and conditions." The trial court denied the motion, struck the affidavit as offered to impeach the verdicts,[2] and entered judgment on the jury's verdicts.

## Case No. A05A2352

1. Contending that Paragraph 5 "should have never been presented to the jury in the first place," the City charges the trial court with error by failing to rule that Paragraph 5 was unenforceable as a matter of law. The City cites two grounds. First, it argues that the Paragraph is against public policy pursuant to OCGA § 13-8-2.[3] Second, the City argues that it cannot be bound by Paragraph 5 because it "is contained in a contract that [the City] did not execute pursuant to its official city charter." The City points to evidence that no City employee or elected representative signed the proposal acceptance sheet. It also points to evidence that, although the proposal faxed to its utilities director expressly incorporated an acceptance sheet and a statement of applicable conditions, one of which was Paragraph 5, these pages were not included in the fax. In reliance on *H. G. Brown Family L.P. v. City of Villa Rica*,[4] the City characterizes its entire agreement with Law Engineering as ultra vires and therefore void.

But the City did not seek to exclude from admission into evidence — and thus from consideration by the jury — Paragraph 5 on either of these grounds by pretrial motion or by timely trial objection. Not until *after* the jury assessed damages did the City attempt to invoke

---

[2] OCGA § 9-10-9 (affidavits of jurors may be taken to sustain, but not to impeach, their verdict).

[3] Subsection (b) deems contrary to public policy an agreement
in connection with or collateral to a contract or agreement relative to the construction, alteration, repair, or maintenance of a building structure, appurtenances, and appliances, including moving, demolition, and excavating connected therewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents or employees, or indemnitee. . . .

[4] 278 Ga. 819, 820 (1) (607 SE2d 883) (2005) ("If the contract was imperfectly or irregularly executed, it may not necessarily be completely ineffective, as long as it was the type of contract within the power of the local government to make. But if the limitation ignored was one which placed the contract completely beyond the power or competence of the local government, then the contract will be termed ultra vires, and its status is an absolute nullity. Where a city charter specifically provides how a municipal contract shall be made and executed, the city may only make a contract in the method prescribed; otherwise, the contract is invalid and unenforceable.") (punctuation and footnotes omitted). Although the City cites provisions of the City charter vesting municipal authority in the City Council and Mayor, the City concedes that the charter is "otherwise silent with respect to the execution of contracts." Furthermore, the City makes no assertion that its agreement with Law Engineering was of a type that the City was not empowered to make.

a ruling from the trial court that Paragraph 5 was unenforceable as a matter of law. In its appellate brief, the City asserts, "The City preserved the errors relating to enforceability and voidability of [Paragraph 5] by means of their briefing in opposition to the summary judgment and directed verdict motions asserted by Law Engineering." The portion of the record cited by the City shows, however, that such responses sought merely the denial of Law Engineering's motions. The responses did not seek a ruling from the court precluding or limiting the jury's consideration of Paragraph 5 as a matter of law.[5]

Generally, the scope of appellate review is limited to the scope of the trial court's ruling as shown by the record and cannot be enlarged or transformed through a process of switching or shifting.[6] "Fairness to the trial court and to the parties demands that legal issues be asserted in the trial court."[7] This court is one for the correction of errors committed by the trial court where proper exception was taken.[8] Here, the City failed to properly except to the jury's consideration of the clause as a matter of law. Consequently, it waived appellate review of whether Paragraph 5 should have been presented for the jury's consideration.

2. The City contends that the trial court erred in denying its motion for addittur and striking the affidavit presented in support of the motion. But as noted in Division 1, not until after the jury returned its verdicts did the City seek a ruling that Paragraph 5 was unenforceable as a matter of law and that it should have been excluded from the jury's consideration. Such a post-verdict motion cannot be used to strike evidence and reopen the case for consideration of new legal issues.[9] The trial court did not err in denying the motion, and the issue regarding the affidavit is moot.

*Case No. A05A2353*

3. Law Engineering contends that the trial court erred in refusing to grant it judgment as a matter of law on the ground that the City's claims against it were time-barred. It argues that the City's claims against it accrued in early 1994, when the City received and

---

[5] Compare, e.g., *Fellows v. All Star*, 272 Ga. App. 262, 264 (1) (612 SE2d 86) (2005) (although termed a motion in limine, the party's motion "plainly sought a ruling from the trial court" whether as a matter of law an agreement could be enforced).

[6] *Luxenberg v. Griffith*, 237 Ga. App. 201, 202 (1) (514 SE2d 63) (1999).

[7] *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002).

[8] *Hadlock v. Anderson*, 246 Ga. App. 291, 295 (2) (540 SE2d 282) (2000).

[9] See *Lincoln v. Tyler*, 258 Ga. App. 374, 377 (3) (574 SE2d 440) (2002), rev'd on other grounds, *Tyler v. Lincoln*, 272 Ga. 118 (527 SE2d 180) (2000).

paid for its report, and thus, under various four-year limitation periods, the City's claims expired years before it filed its lawsuit in March 2001.[10] "When a question of law is at issue, such as whether the statute of limitation bars an action, we owe no deference to the trial court's ruling and apply the plain legal error standard of review."[11]

In light of evidence that the City's LAS, which was part of the realty, malfunctioned and can never operate at the capacity for which it was designed, we find applicable to this case OCGA § 9-3-30 (a).[12] The Code provision requires actions for damage to realty to be brought "within four years after the right of action accrues." Accordingly, we turn to whether the City's causes of action accrued more than four years before March 22, 2001.[13]

(a) One of the theories that the City advanced to recover its economic losses was negligent misrepresentation. The essential elements of that cause of action are: "(1) the defendant's negligent supply of false information to foreseeable persons, known or unknown; (2) such persons' reasonable reliance upon that false information; and (3) economic injury proximately resulting from such reliance."[14] "A plain reading of the essential elements underlying [the City's] cause of action shows that in order to file a legitimate claim, [the City] had to show actual economic loss proximately resulting from [Law Engineering's] negligent misrepresentation."[15] "Thus, until economic loss actually was sustained by [the City], it did not have a cause of action against [Law Engineering], and the prescriptive period did not begin to run."[16]

We reject Law Engineering's position that the City could have brought its claim for negligent misrepresentation in early 1994, when

---

[10] See footnote 1, supra.

[11] *Harpe v. Hall*, 266 Ga. App. 340 (596 SE2d 666) (2004) (citation and punctuation omitted).

[12] See *Bowen & Bowen v. McCoy-Gibbons, Inc.*, 185 Ga. App. 298, 301-302 (1) (b) (363 SE2d 827) (1987) (OCGA § 9-3-30 governed where, although the soils engineering firm's soil testing did not of itself immediately produce the resultant problems with the structure that was part of the realty, the gravamen of the complaint was that the firm's actions led to the damage to the realty because the construction of the structure was based on the soil testing and recommendations), rev'd on other grounds, *Corp. of Mercer Univ. v. Nat. Gypsum Co.*, 258 Ga. 365, 366 (1) (368 SE2d 732) (1988) (confining "discovery rule" to cases of bodily injury that develop over an extended period of time); see generally *Travis Pruitt & Assoc. v. Bowling*, 238 Ga. App. 225, 225-226 (1) (518 SE2d 453) (1999); accord *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas*, 267 Ga. 424, 426 (1) (479 SE2d 727) (1997).

[13] See footnote 1, supra.

[14] *Hardaway Co.*, supra.

[15] Id. at 427.

[16] Id.

the City received the report. "[I]n a claim for economic injury sustained due to reliance upon false information negligently provided by a defendant, the statute of limitation begins to run when the plaintiff suffers pecuniary loss *with certainty*, and not as a matter of pure speculation."[17] The evidence showed that not until after it activated its LAS, in March 1998, did the City incur pecuniary losses due to misrepresentations in Law Engineering's report.

Public policy considerations lead to our rejection of Law Engineering's argument that the City suffered pecuniary losses in early 1994, when it paid Law Engineering's invoices for the report. Implicit in this argument is the assumption that the City was somehow obligated to make its own evaluation of Law Engineering's results to determine whether they were in fact reliable. To conduct such an evaluation, the City would have had to employ the services of another engineering firm. We decline to endorse, even by implication, such a wasteful approach to public spending.[18]

The City suffered pecuniary losses with certainty at the earliest in March 1998, when its LAS was activated and immediately malfunctioned. Because the City filed suit against Law Engineering well within four years of that time, the negligent misrepresentation claim was not time-barred.[19]

(b) In light of the jury's general verdict against Law Engineering, we do not reach whether the trial court erred in rejecting Law Engineering's motions concerning statutes of limitation for the remaining theories that the City advanced.

4. Law Engineering contends that the trial court erred in refusing to grant it judgment as a matter of law on the ground that the City's case against it was barred by the economic loss rule. The purpose of the economic loss rule is "to distinguish between those actions cognizable in tort and those that may be brought only in contract."[20] The Supreme Court of Georgia has explained,

> The "economic loss rule" generally provides that a contracting party who suffers purely economic losses must seek his remedy in contract and not in tort. Under the economic loss rule, a plaintiff can recover in tort only those economic losses resulting from injury to his person or damage to his property....[21]

---

[17] Id. at 428 (emphasis supplied).

[18] See id.

[19] Id. at 427-429.

[20] *Flintkote Co. v. Dravo Corp.*, 678 F2d 942, 949 (11th Cir. 1982); see *Vulcan Materials Co. v. Driltech, Inc.*, 251 Ga. 383 (306 SE2d 253) (1983).

[21] *Gen. Elec. Co. v. Lowe's Home Centers*, 279 Ga. 77, 78 (608 SE2d 636) (2005) (footnote omitted).

Law Engineering's contention that the economic loss rule shielded it from liability overlooks the "misrepresentation exception" to the economic loss rule.[22] This exception has been defined as follows:

[o]ne who supplies information during the course of his business, profession, employment, or in any transaction in which he has a pecuniary interest has a duty of reasonable care and competence to parties who rely upon the information in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended that it be so used. This liability is limited to a foreseeable person or limited class of persons for whom the information was intended, either directly or indirectly.[23]

Because Law Engineering falls within this exception under the City's claim of negligent misrepresentation, the trial court did not err in overruling Law Engineering's motions that the economic loss rule barred the City's case against it.[24]

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED MARCH 28, 2006 —
RECONSIDERATION DENIED APRIL 11, 2006.

*Troutman Sanders, William M. Droze, Douglas A. Henderson, James J. Mills*, for City of Cairo et al.

*Pursley, Lowery & Meeks, John R. Lowery, Smith, Gambrell & Russell, Stephen E. O'Day, Andrew M. Thompson*, for Hightower Consulting Engineers, Inc. et al. and Mactec Engineering & Consulting of Georgia, Inc.

---

[22] *Holloman v. D. R. Horton, Inc.*, 241 Ga. App. 141, 147-148 (4) (524 SE2d 790) (1999); see *Advanced Drainage Systems v. Lowman*, 210 Ga. App. 731, 733-735 (2) (437 SE2d 604) (1993).

[23] *Holloman*, supra at 148, quoting *Lowman*, supra at 734.

[24] *Robert & Co. Assoc. v. Rhodes-Haverty Partnership*, 250 Ga. 680, 681-682 (300 SE2d 503) (1983); *Holloman*, supra.